Argued May 21; affirmed July 8; rehearing denied October 7, 1941

# DeWITT *v.* SANDY MARKET, Inc.

(115 P. (2d) 184)

Before KELLY, Chief Justice, and BAILEY, LUSK, RAND and ROSSMAN, Associate Justices.

*William J. Crawford* and *John R. Latourette,* both of Portland (Latourette & Latourette, both of Portland, on the brief), for appellant.

*Glen R. Jack,* of Oregon City (Sheppard & Phillips, of Portland, and Kenneth E. Proctor, of Oregon City, on the brief), for respondent.

LUSK, J. This is an action based on negligence to recover damages for personal injuries. The plaintiff, Gertrude S. DeWitt, was thrown to the pavement while walking across a street in the city of Portland, and

claims that she was run into by an automobile truck owned and operated by the defendant. The defendant denied on information and belief that the plaintiff came in contact with its truck at all, and alleged plaintiff's contributory negligence, the act of a third party, and unavoidable accident as defenses. The jury found for the defendant, and on this appeal from the ensuing judgment the plaintiff assigns as error the refusal of the court to withdraw from the jury's consideration each and all of the affirmative defenses and a ruling of the court excluding from the evidence a certain photograph offered by the plaintiff.

The accident occurred on February 10, 1940, at about 6:00 p. m. in or near a crosswalk at the intersection of SE. 32nd Avenue and Division street. The former street runs north and south, the latter east and west. The intersection is not regular, the west curb of 32nd Avenue north of Division street being more than twenty-six feet west of the west curb of 32nd Avenue south of Division street. Hence, to go from the sidewalk at the northwest corner of the intersection to the sidewalk at the southwest corner one must proceed diagonally in a southeasterly direction. Division street is thirty-six feet wide, an arterial highway which usually carries heavy traffic. Rain was falling at the time of the accident, and it was dark enough to require motorists to have their lights on. Miss DeWitt, the plaintiff, met with her accident while crossing from the north to the south side of Division street on the west side of 32nd Avenue. She, the driver of a west-bound automobile, and the driver of an automobile which was following the defendant's east-bound truck, were the only eyewitnesses to the occurrence. While the driver of defendant's truck saw the plaintiff in the street, he testified that he knew nothing of an accident until

some time later. Owing to the nature of the questions presented it will be necessary to set out the testimony in some detail.

The plaintiff is a school teacher who was returning to her home at the end of the day. She was in good health and able to engage in outdoor exercise such as mountain climbing, but limped slightly in her right foot, a disability which she had had since birth. She lived on 30th Avenue, one block south of Division street, or about three blocks southwest of the place of the accident. She had come as far as Division street on a south bound bus, from which she alighted at the northwest corner of Division street and 32nd Avenue. She testified in substance as follows: Before undertaking to cross Division street she looked, saw a car approaching from the east, and a line of traffic consisting of several cars approaching from the west. The west bound car was approximately a block away. She started to cross in the pedestrian crosswalk (which was not marked), but when she reached the center of the street stopped and turned toward the west, facing the oncoming traffic, and decided to wait for these cars to pass instead of crossing in front of them as she had intended, as they were nearer than she thought when she started to make the crossing. The second vehicle in this line of traffic was defendant's truck. The lead car passed her, and, as she stood there sure that she was a safe distance from it, the defendant's truck collided with her left shoulder and she knew nothing that happened afterwards. The truck was partly on the left-hand side of the street.

S. K. Elliott was the driver of the automobile following immediately behind the truck. He saw the plaintiff start across the street, "seemingly in the pedestrian

lane, and it appeared as though she were walking straight across the street''. She seemed to pause in the center of the street. The west bound automobile passed her without hitting her—''you could definitely see space in between the car and the lady.'' He estimated this space as a minimum of a foot. The truck was traveling slightly north of the center of the street. (There was no line painted on the street to mark the center.) In answer to the question ''How close did she come to the truck, do you know that?'', he answered, ''It looked as though she was right up against it'', and stated that ''After the truck passed her she was falling in the direction directly towards me''. She was between six and eight feet in front of the witness' car when he stopped. He was asked whether he could say definitely whether the truck struck her and answered, ''She was definitely against the side of the truck as it passed beyond a point of support for her''. He estimated the speed of the west bound car as twenty-five miles per hour and that of the truck about the same. We quote from his cross-examination:

''Q You think she fell, as you said, when the support of the Sandy truck passed she just dropped right there, did she?

''A Well, now, that is pretty hard to say, whether she dropped immediately. She fell in my direction. Her head was closer to me than her feet, that is, and I think definitely the truck was supporting her right at that time from going over south. She would have gone further south had it not been—

''Q (Interrupting) In other words, something was propelling her south, and you think the truck was supporting her?

''A No, I don't say it was propelling her south, but had the truck not been there at that point she would have fallen further south, because she was against

the side of the truck there. As soon as the truck passed, the back end of the truck passed, she was falling.

"Q In other words, where she had walked out in the street, like I am walking up here now, that is the point where she started falling?

"A No, she didn't seem to fall right away. Her hands went up from her sides.

"Q Well, did she move or walk or—

"A I didn't notice her moving at all there. Her hands flew out from her sides. The next view I had of her she was right against the back end of the truck and then started falling."

Again, on cross-examination, he testified:

"Q And from the point where you were driving behind him, could you see the lady cross that street at all times?

"A I saw her up to the point where she was between,—I thought—my first view was that it was going to be awfully close, that was my first impression.

"Q In other words, close for the car that was going the opposite direction to you?

"A No, but there wasn't going to be much space, and then I definitely saw that the coupe was clear of her and her hands were going up about that time, and then it was just a fractional part of a second until she was on the pavement.

"Q In other words, the car going west and the truck going east passed with the young lady between them?

"A Yes, it was the latter part of the car going west which would have been,—as one point on either side of the lady."

Armand Close was the driver of the automobile traveling west on Division street. When he was about 175 feet east of 32nd Avenue he saw the plaintiff standing at the curb on the northwest corner of the intersection. About seventy-five feet ahead of him was

a black coupe which had passed him between 33rd and 34th Avenues and was traveling at the rate of approximately forty-five miles per hour, which was faster than the speed of the witness. He saw the plaintiff step from the curb and walk directly south to about the center of Division street, where she stopped. He was asked whether he observed her position as to east and west, and answered: "Well, she would be very close to the crosswalk there. I couldn't tell within a foot or so, but she was very close to the crosswalk or in the crosswalk." His observation of what occurred is best shown by the following excerpt from his testimony:

"Q Now, just in your own words tell the jury what happened after you saw this lady stop in this position that you have indicated there on the map?

"A Well, she stopped there, and the black coupe going in the same direction that I was moved over a little bit towards his own side of the street.

"Q Now which side would that be?

"A That would be the north side.

"Q The north side, All right, proceed.

"A And kept right on going at the same rate of speed. I didn't see him slow down at all, and the truck was very close to if not on the center of the street.

"Q How do you know that?

"A Because I had to move over a little bit to let him by. He kept right on going past me, and I moved over two or three feet just to make sure that I was safe, too.

"Q Now, where this lady was standing, as you have indicated here on the map, how far was this black coupe away from her when it passed her?

"A I couldn't see that at all.

"Q Well, was it any distance?

"A Well—

"Q What is your best judgment?

"A In my estimation there was plenty of room between the black coupe and her, but the way the acci-

dent happened it happened so funny that I really couldn't say.

"Q Well, can you say for sure that the truck was on or near the center line?

"A Yes, I do know that.

"Q Now, then, what next did you observe about the woman?

"A Well, she,—just as the truck cab was past her, passing her or slightly past her, she threw up her hands and spun around and hit the back of her head against the side of the truck, and she seemed to keep spinning in the street and then fell.

"Q Now, which way was she facing when the truck went by?

"A South, south and I would say slightly west in the direction of the truck."

On cross-examination he testified:

"Q And the truck and the black coupe passed at the same time, didn't they,—at the same time they passed the woman, I will put it that way?

"A No, the coupe seemed to pass her a little bit before the truck did.

"Q And went on?

"A Yes, he kept on going.

"Q And the truck went on also?

"A That is right.

"Q But as to whether or not there was any contact between the truck and the lady, if there was, if I understood your testimony, it was right at the back end?

"A No, that is not the way I explained it. I believe that she hit the side of the truck up near the front, not at the front of the body but near the front of the body.

"Q As I understood your testimony you couldn't see any contact except at the back end of the truck?

"A No, there was something there to spin her around, it seemed to hit her on the left shoulder.

"Q Yes, but whatever it was that spun her around, you don't know about that?

"A No, I couldn't say as to that.

"Q Anyhow she seemed to spin or turn and then there was a contact, in your opinion, right at the rear of the truck?

"A That is right.

"Q And did she fall right where the,—she struck the rear of that car?

"A No, she didn't. Well, she spun around there quite a little bit. It just got her spinning like a top, and as near as I can tell she fell quite a little bit to the west of where she was hit.

"Q In the direction from which the truck came?

"A That is right."

He testified further on cross-examination that it was not until after the plaintiff had moved from a standing position that he could see any contact with the truck, and that the truck was very near or on the center of the street—possibly over the center. The witness was driving a foot and a half or two feet from the center of the street and the coupe more on its side of the street than he was.

The driver of the defendant's truck, Forrest Lauderback, testified that he had driven the truck on the day of the accident from the defendant's market at Sandy, Oregon, to 10th and East Morrison streets in Portland, where he took on a load of case milk and pipe. He then started back to Sandy, and, as he proceeded east on Division street and approached the intersection of 32nd Avenue, he was driving about two feet from the center of the street on his own right-hand side and at a rate of speed of about twenty to twenty-five miles per hour. He saw the plaintiff when he was about a block distant from her. She was fairly close to the center of the street on the north side. He did not change his speed, but moved over to the right and was approximately six feet from her when he passed her. The west bound car passed her at the same time "going

pretty fast". He felt no "bump" and heard nothing unusual and drove on, and it was not until he was stopped by a police officer as he neared Sandy that he learned of the accident. He did not know how close the west bound car was to the plaintiff, and said, "She was standing safe when I last seen her"—"safe from me and the other car I figured". His truck was equipped with a driver's cab and an enclosed body. He testified that nothing projected from the truck. There were doors on either side of the body close to its forward part. He had loaded the truck through the right-hand door, and the left-hand door, that is, the one on the side nearest to the plaintiff, remained closed all the time. He explained the mechanism by which the door is opened and closed. We quote from the statement of his testimony in the bill of exceptions:

"On cross-examination witness Lauderback was questioned about the construction and operation of the left side door of the truck. He testified that it was hinged on the forward side of the body and swings open to the front. He testified that the door when shut is made secure by means of an iron bar which is attached to the body of the truck at the rear edge of the door, which swings in and is fastened to the door by means of a latch on the door. To open the door the latch is removed from the bar, the bar is swung out perpendicular to the side of the truck about 12 to 14 inches, and the door may then be opened, swinging in the opposite direction toward the front of the truck. The witness testified that when the bar is out the door automatically comes out, but he expressed difficulty in describing its construction and how the door opened."

He examined the truck with the police officer who stopped him and with Albert Hoffman, one of the proprietors of Sandy Market, Inc., and found no new markings on it, except that at the left rear corner there

was a little place where the road dust appeared to have been disturbed, "just like somebody had walked past it; not like anything had hit it, just enough to disturb that."

Cliff P. Boss, the police officer who intercepted Lauderback after the accident, examined the truck for indications of a collision. He found nothing loose or projecting from the left side of the truck and no markings except a few old scratches and the evidence of disturbance of the road dust to which Lauderback, as well as Hoffman, testified.

George Phillips, a police officer, arrived upon the scene of the accident as the plaintiff was being placed in the ambulance. The witness Elliott and another man pointed out to Phillips the place where the plaintiff lay after the accident. At this place there was a small splotch of blood about the size of a man's hand. Phillips testified that he made measurements and that the spot pointed out to him was eighteen feet west of the west property line of 32nd Avenue and fifteen feet north of the south curb of Division street. He did not testify, and was not asked by counsel on either side, whether he measured from the west property line of 32nd Avenue on the south side of Division street or on the north side of that street.

The foregoing, we believe, fairly summarizes all the pertinent evidence in the case bearing on the conduct of the plaintiff and of the driver of the truck and the happening of the accident. In the light of the evidence we come to a consideration of the contentions advanced by the plaintiff for a reversal of the judgment.

The defendant's answer contains three purported affirmative defenses, the third of which was withdrawn by the court from the consideration of the jury and does not concern us here. The first affirmative answer

alleged in substance that if the plaintiff did come in contact with the defendant's truck at all it was because the west bound automobile "did drive directly at the plaintiff in such a way and manner as to cause her to brush the rear left corner of the truck of this defendant" and that plaintiff's injuries "were caused by the independent, intervening act of a third person, over which this defendant had no control whatsoever and was unavoidable in so far as defendant was concerned."

The second affirmative answer charged the plaintiff with contributory negligence as follows:

"(a) She failed and refused to grant to the truck of defendant the statutory right of way.

"(b) She failed and refused to use the regular pedestrian crossing at said time and place.

"(c) She walked out into the street and into heavy traffic travelling both ways when she knew, or could have known by the exercise of her faculties, that it was dangerous to so do.

"(d) She failed and refused to keep a proper lookout or any lookout whatsoever for traffic using said Division Street.

"(e) She did not wait on the curb in a place of safety until traffic had cleared in front of her.

"(f) She knowingly placed herself in a position of danger, if any there was.

"(g) She did not use reasonable diligence in looking out for her safety under conditions of her disability, and did, if she came into contact with the said truck, walk or fall into the right rear corner thereof."

By written requests for instructions the plaintiff sought to have the court withdraw from the jury's consideration the pleas of intervening act of a third person and unavoidable accident and the issues of contributory negligence, both separately and as a whole. The court refused to give any of the requested

instructions, and submitted to the jury all the issues made by the first and second affirmative answers. These rulings are assigned as error and will be discussed in the order stated.

1. *Independent, intervening act of a third party and unavoidable accident.*

■ (a) It is urged that there is no evidence that plaintiff's injuries were caused by the driver of the west bound automobile. The plaintiff herself was the only witness who testified directly that the truck ran into her. It is inferable from the testimony of both Close and Elliott that for some reason the plaintiff started to move from her standing position in the center of the street towards the south side of Division street before the collision occurred. She was seen to throw up her hands and "spin around" before either of these witnesses saw her in contact with the truck. To Elliott the truck seemed to be "supporting her right at that time from going over south", and "had the truck not been there at that point she would have fallen further south". And, while both Elliott and Close, as well as the defendant's driver, testified that the west bound coupe was clear of her, Close also said: "In my estimation there was plenty of room between the black coupe and her, but the way the accident happened it happened so funny that I really couldn't say." The plaintiff stood in the center of the street, according to her own testimony, waiting for the truck to go by. She was between the two vehicles as they passed, the coupe traveling at a high rate of speed. There is evidence that the truck was six feet away from the plaintiff at the time that it started to pass her. Even though it should be said that there is no evidence that the coupe struck her, there are facts from which the jury would

have been justified in finding that the plaintiff thought that she was in danger from the fast traveling vehicle behind her and that she moved suddenly forward to escape it, and in so doing ran into the rear of the truck. This being so, it was not error to refuse to withdraw from the consideration of the jury the issue of the act of a third party.

■ (b) The answer does not allege baldly that the accident was unavoidable but that it was "unavoidable in as far as defendant was concerned." That would not be an affirmative defense, but merely an argumentative denial of the charge that the defendant was negligent. The court defined an unavoidable accident as "one which occurs without wrongful acts on the part of either plaintiff or defendant." No exception was taken to this instruction, and the only question before us is whether it was reversible error to refuse to withdraw from the jury's consideration a so-called affirmative defense which in fact presents nothing but an issue included in the general denial. The decisions of this court upon the propriety of giving an instruction on unavoidable accident are reviewed at length in *Murphy v. Read*, 157 Or. 487, 72 P. (2d) 935. That was a case where a pedestrian, crossing the street in a regular pedestrian crossing and who was not accused of negligence, was run down by a motorist. The trial court's refusal to charge on unavoidable accident was held not to be reversible error, the court saying (157 Or. 491):

"In a case where no negligence is charged on the part of plaintiff leaving as the only issue that of alleged negligence on defendant's part, an instruction on unavoidable accident is merely a repetition of the charge that if no negligence has been proven on defendant's part proximately causing the accident the verdict of the jury should be for the defendant."

It was therefore held that the trial judge's failure to repeat the charge ''in the form of the requested instruction upon unavoidable accident'' did not constitute reversible error. In the instant case the question of defendant's negligence was clearly one of fact for the jury, and, if it was found that the defendant was free from negligence, then in that sense and in accordance with the averment of the answer, it could be said that the accident was unavoidable. That is as far as the issue tendered went, and it was not reversible error to refuse to withdraw it.

2. *Statutory right of way.*

■ Under this head we treat two assignments of error based on the trial court's refusal to withdraw charges in the answer that the plaintiff failed to yield to the defendant the statutory right of way and was negligent in failing to use the regular pedestrian crossing. It is the plaintiff's position that there is no evidence to support either of these charges of contributory negligence. We think that this position cannot be sustained. As we have seen, there is evidence that the plaintiff walked straight ahead after leaving the sidewalk at the northwest corner of the intersection. A mark placed by one of the witnesses on a map received in evidence indicates that when she stopped near the center of the street she stood approximately on a line with the west property line of 32nd Avenue, north of Division street. The measurement made by Officer Phillips, if taken from that property line, would be some evidence that she was not in the crosswalk at the time of the accident. The defendant argues that because Phillips measured the distance from the south curb he must have measured from the property line on that side of the street, but as he did not so testify we cannot so determine, and the

interpretation of his testimony was for the jury. Apart from all this the jury could have found from the plaintiff's own testimony and that of her witnesses that she was not in the crosswalk. The statute in effect at the time of the accident was 8 O. C. L. A., § 115-301. By subdivision (s) of that section "sidewalk" is defined as "that portion of a street between the curb lines, or the lateral lines of a roadway, and the adjacent property lines intended for the use of pedestrians." By subdivision (t) "crosswalk" is defined:

"That portion of a roadway at an intersection included within the connections of the lateral lines of the sidewalk on opposite sides of the street or highway measured from the curbs or, in the absence of curbs, from the edges of the traveled roadway; or any portion of a roadway at an intersection or elsewhere distinctly indicated for pedestrian crossing by lines or other markings on the surface of such roadway conforming in design to standards prescribed by the state highway commission."

The foregoing statute is an amendment (Oregon Laws 1939, Ch. 534, p. 1167) of § 55-1901, Oregon Code Supplement 1935, which by subdivision (t), defines a crosswalk as "that portion of a roadway ordinarily included within the prolongation or connection of curb lines and property lines at intersections * * *"

The present statute appears to have been enacted for the purpose of clarifying the meaning of crosswalk as applied to an irregular intersection such as the one with which we are here concerned. Whatever may have been intended by the old statute, there is no question, as we view it, that under the amended definition the crosswalk at this intersection runs diagonally from the northwest corner to the southwest corner of the inter-

section. In no other way could effect be given to the provision that the crosswalk is that portion of a roadway "included within the connections of the lateral lines of the sidewalk on opposite sides of the street". If, therefore, the plaintiff walked straight south as she testified, and if she stopped at the place indicated by the cross marked on the map in evidence, the jury could have found that she was several feet west of the crosswalk when the accident occurred. In these circumstances it was for the jury to determine whether she was negligent in failing to use the crosswalk and in not yielding the right of way to the defendant's truck. If the accident was caused by the plaintiff colliding with the left rear portion of the defendant's truck while she was not in the crosswalk it would have been as much a violation of the provision giving motor vehicles the right of way over pedestrians so proceeding as though she had walked in front of the truck. 8 O. C. L. A., § 115-340 (c).

### 3. *Remaining charges of contributory negligence.*

■ These are that the plaintiff walked out into the street and into heavy traffic when it was dangerous to do so; did not wait on the curb until the traffic had cleared; did not keep a proper "lookout for traffic"; knowingly placed herself in a position of danger; and did not use reasonable diligence in looking out for her safety under conditions of her disability.

The first two of these specifications come to the same thing: that the plaintiff was negligent in undertaking the crossing at the time she did and in view of the conditions existing. Even though the plaintiff stepped off the curb into the crosswalk and proceeded therein, she was not, by the express terms of 8 O. C.

L. A., § 115-340 (d), relieved from the duty to exercise due care. See, *Hecker v. Union Cab Co.*, 134 Or. 385, 389, 293 P. 726; *Keys v. Griffith*, 153 Or. 190, 196, 55 P. (2d) 15. And certainly no less a duty would devolve upon her if she was not using the crosswalk. The applicable rule is thus stated in *Keys v. Griffith*, 153 Or. 190, 195:

"It has been repeatedly held by this court and it seems to be the rule generally that, when a pedestrian, who is about to cross a street or highway, sees an automobile approaching at such a distance from him that would lead a reasonable person to believe he can cross in safety, he has a right to proceed without waiting for the automobile to pass, and is not guilty of contributory negligence in so doing. The question in such a case is: Did the pedestrian use that degree of care for his own safety which an ordinarily prudent person would use in the same place and under the same conditions? And ordinarily this is a question of fact for the jury and not one for the court" (citing a long list of Oregon decisions).

See, Anderson, An Automobile Accident Suit, 920, § 761; *Trentman v. Cox*, 118 Ohio St. 247, 160 N. E. 715; *Feigin v. Malbin*, 171 N. Y. S. 245.

■■ The plaintiff undertook the crossing when an automobile was approaching from the east at a speed of forty-five miles per hour at a distance variously estimated from 125 feet to 200 feet from her, and a line of traffic was approaching from the west about a block away. It was about dark and raining. The plaintiff's lameness—such as it was—could have been found to impede her ability to move rapidly. Reasonable minds, weighing all the facts, might well differ on the question whether she was in the exercise of due care in undertaking the crossing at the time that she did. She had

the right, of course, to rely on the exercise of care and obedience to the rules of the road by motorists, but these were simply factors to be considered in appraising her conduct. All this was explained by the trial judge in carefully prepared instructions. Under our decisions and the law generally the question was properly one for the jury.

 The general rule, of which the foregoing is a specific application, that the alleged contributory negligence of a pedestrian is ordinarily a question of fact for the jury, governs the other specifications. It is said that there is no evidence that the plaintiff did not keep a proper lookout, because the plaintiff testified that she stopped and looked at the defendant's truck, the driver of the truck so testified, and the answer alleged that plaintiff, after looking at defendant's vehicle, stopped and indicated to the driver to proceed. But, we think it sufficiently clear from the statement of the evidence which has been made, that the plaintiff could have been found to have relaxed her vigilance before her injury— that if, as some of the evidence indicates, she went forward and collided with the side of the truck, the accident was due, in part at least, to her failure to watch out and to exercise that degree of care for her own safety which the circumstances and what could be considered the danger of her position enjoined as reasonable care in the circumstances.

We conclude, therefore, that the trial court ruled correctly in refusing the request of the defendant to withdraw the specific charges of contributory negligence, and that being so there was, of course, no error in refusing to withdraw them as a whole.

 The plaintiff argues that the defense of act of a third party is inconsistent with that of contributory

negligence. It is said that contributory negligence is a voluntary act (citing *Dowd v. N. Y. Ry. Co.*, 170 N. Y. 459, 63 N. E. 541), whereas, if, as alleged in the answer, the plaintiff was forced against defendant's truck by the west bound coupe, her conduct necessarily would have been involuntary and she could not have been guilty of violating the right of way rule. This contention is not predicated upon any ruling of the court below, nor was it suggested at any time before the case reached this court. This is a court of review which (except in the limited class of cases in which it exercises original jurisdiction) sits only to pass upon rulings on questions of law made by the circuit court. Hence, we hold that the question sought to be raised is not before us. Had the plaintiff desired to raise it in the court below, the proper practice would have been by motion to strike or to elect; otherwise the point is waived. *Epplett v. Empire Investment Co., Inc.*, 99 Or. 533, 194 P. 461, 194 P. 700; *Wyoming Construction & Development Co. v. Buffalo Lumber Co.*, 25 Wyo. 158, 166 P. 391; *Smith v. Ferguson*, 187 Ky. 338, 219 S. W. 160; 49 C. J., Pleading, 831, § 1229.

Plaintiff's counsel say that this principle is not applicable, that the case is governed by the rule of *Johnson v. Steele*, 154 Or. 137, 59 P. (2d) 237, and similar cases, where it is laid down that a direct admission of a fact in a pleading will be held to prevail over an attempt to deny the same fact. We do not regard the allegation of the act of a third party in defendant's answer as an admission that the plaintiff did not violate the defendant's right of way, and think that plaintiff's counsel could not have so regarded it upon the trial, else they would not have requested the court to withdraw the former issue from the consideration of the jury.

Upon objection of the defendant, the court excluded from the evidence plaintiff's Exhibit "K" for identification, a photograph of the defendant's truck. The photograph shows the door on the left side of the truck. The door is closed, and the bar twelve or fourteen inches in length, described by the witness Lauderback, is shown projecting at right angles to the side of the vehicle, with a man named Kellogg DeWitt standing nearby. Plaintiff claims for this exhibit that it shows the mechanism of the door, which Lauderback confessed his inability to explain clearly, and that it contradicts his testimony that the door automatically swings outward with the bar. It further shows, according to plaintiff's contention, that the bar is not attached to the door but to the body of the truck, from which it is argued that releasing the bar could not automatically effect the opening of the door. And relevancy is asserted for the exhibit because it is said that there was evidence from which the jury could have found that the bar, extended outward from the truck as illustrated in the photograph, struck the plaintiff and caused her to spin around in the manner testified to by the witness Close; and attention is called to testimony that the coat which plaintiff was wearing was torn at the left shoulder in the accident.

Four witnesses saw the defendant's truck before the accident—the plaintiff, Close, Elliott, and Lauderback. Not one of them testified that the bar or anything else extended outward from the truck. It could be argued perhaps that in the obscure light the plaintiff and her witnesses would not have seen the bar even though it had been there. But, unless the plaintiff is entirely mistaken in her testimony that she was struck as she stood in the street, this bar could not have caused the tear in the shoulder of her coat, because the plﾍn-

tiff, as appears from a photograph of her in evidence, is a woman of average height, while the bar, as pictured in Exhibit ''K'', is located only slightly above the waistline of the man standing near it. If, however, we were to assume that the evidence would warrant an inference that the bar extended outward at the time of the accident, we are of the opinion that the ruling of the circuit judge was correct. The exhibit was offered without any explanation whatever except the testimony of Lauderback on cross-examination that it was a photograph of the truck which correctly depicted the bar when it is out. Plaintiff's Exhibit ''D'' is a photograph of a truck with the bar fastened against the door, and shows the mechanism quite clearly. While it is the effect of Lauderback's testimony that the door opens as the bar is swung out, he did not testify that it was impossible to keep the door closed under those circumstances; and the plaintiff did not see fit to explain who had released the bar before the picture was taken, whether it was a normal operation, or whether pains were taken to accomplish the result disclosed in the photograph. The action of the trial court in admitting or refusing to admit photographs in evidence is largely a matter of discretion which will not be disturbed unless abused. *Knapp v. Standard Oil Co.*, 156 Or. 564, 576, 68 P. (2d) 1052; 20 Am. Jur., Evidence, 609, § 729. Under the conditions here shown we think the exclusion of Exhibit ''K'' was at the very least not an abuse of discretion, if indeed it would not have been erroneous to admit it as unduly emphasizing the claim of the plaintiff with respect to the particular issue which it was offered to sustain. See 22 C. J., Evidence, 914, § 1115. The photograph could easily have been misleading as not merely depicting the door of the truck with the bar released, but as consti-

tuting evidence that the bar was in fact released and extended outward at the time of the accident.

The case was fairly tried and submitted to the jury by the trial judge in clear and comprehensive instructions. Our examination of the record and consideration of the questions presented lead to the conclusion that there is no reversible error, and the judgment is therefore affirmed.

RAND, J., dissents.